Mrs. White, what are some of these names today? But don't tell me. Pietropolo. Oh, that was excellent. It's a rare day when my name is not the hardest name in the courtroom. Ms. Stavroulakis, I think, has me beat today. Okay. What's a rare day when I get anything right? My colleagues will tell you that. If Bruce was here, he's sure to tell you that. Go ahead. That's Judge Smith for the record. May it please the Court, my name is Renee Pietropolo. I represent the appellant, Anthony White. With the Court's permission, I'd like to request four minutes for rebuttal. Okay. Let me start if I can. Let's assume the District Court got it absolutely wrong with this incredible presumption that if three people are walking down the street and one of them is drinking from a bottle in a bag, you can assume the other two are going to take a swig too, that that's dead wrong. But given what the District Court found in terms of the officer's testimony, as soon as the officers, it's an apostrophe, approach, was it Coley, the guy who was drinking? Yes. As soon as they approach Coley, the one officer notices a bulge in White's pocket and White gesturing as though he's going for the balls, and that's the record we're stuck with. I mean, I wasn't a finder of fact there, but the police officer's testimony strikes me as a little bit canned, but we're stuck with it. Even if the initial stop, detention, whatever it is, of White is improper at that point, why doesn't the officer not only have a right to go into his pocket, why doesn't he have an obligation, since I assume that he's cloaked with the same self-preservation instincts that most of us are, and he wants to know if this guy's got a gun in his pocket, why wouldn't he go into the pocket with a padded gun? And in fact, he yelled, gun, supposedly. I have two answers to that question. One is the moment the district court here found as fact that the three gentlemen were seized when the police exited the vehicles and approached with their magistrates. So Mr. White is actually seized at the moment the hand goes in the pocket. And everything after the seizure is obviously fruits of the unlawful seizure. My other response is factually to take issue with some of those facts. Officer Love, in fact, testified that when Mr. White shoved his hand in his pocket, that's when he notices a large unnatural bulge. He doesn't see the outline of anything, and he actually doesn't see the weapon until after he's ordered Mr. White to take his hand out of his pocket. Right, but the weapon's not, I understand in terms of when he saw the weapon, that's not as big a problem as the bulge that might give a reasonable officer cause to suspect there may be a weapon in the pocket. You don't have to wait until he sees the gun. If he has reason to believe that there may well be a gun in the pocket, then he can certainly take steps to protect himself. So the question is, does putting your hand in your pocket give the officer reasonable suspicion to believe that it's a gun when the officer doesn't see the outline of a weapon? And his testimony really was, I would contrast his testimony here with Detective Galt's testimony with respect to Corbin. With respect to Corbin, the officer is saying, Mr. Corbin is looking around, you know, checking out his options. He's doing security checks of this pocket. He's touching that pocket, and his hand's not in his pocket, but he can tell that the pocket is hanging down to the degree that something heavy is in the pocket. The officers talk about most people, if they're carrying an illegal weapon, keep it in their waistband. Some might keep it in their pocket, but most keep it in their waistband. So what we have here, yes, we have a high crime area known for gangs and drug violence, but for these specific gentlemen, there's no evidence in the record that Mr. White is known to be somebody engaged in gang activity, somebody engaged in... Let's assume for the moment that when the police get out of the car, because they were in a car with tinted windows, and if you were Davis, Corbin, and White, you might think that was a rival gang as opposed to a police car, because it was unmarked. And the police tell them to halt, and let's assume that they are seized at that moment. They don't feel free to leave. The very next thing, before anything else happens, is that you see Mr. White moving his hand in a way, and the bulge, and one of the officers yells, gun, he's got a gun. What are you supposed to do if you're a police officer? Well, at that moment, the officer sees the gun. I mean, the government actually assumes that some of the facts you posited right now are true, and they're not true. There was no evidence that they suspected this was a rival gang approaching, or even that they were in a gang, so it was a rival gang. That actually would be helpful to you, right? I mean, it's an unmarked police car, but once the police are out, it's a surprising and a startling moment. And let's assume that they were seized. That's in your favor. Yes. But then, within a second, or almost right at the very same time that this is happening, a police officer, through his experience, sees something that appears that one of the individuals, and it turns out two of the individuals, have a gun. What is that police officer supposed to do in that context? Again, factually, the officer saw the gun after he ordered Mr. White to take it out. And so you see the gun. Of course, the officer can take steps to remove the gun from Mr. White. But, in fact, the officers have reasonable suspicion to believe Davis is violating an open container ordinance. To say that because they have reasonable suspicion to stop Mr. Davis, that they can then detain Mr. White in some way to make sure, that's a tarry. I agree with you. They shouldn't have seized, in my example, they should not have seized either White or Corbin. Although Corbin, I guess, started sort of moving. But conceive that. The police officer then sees something that could put this police officer and the others with that police officer in danger. What is that police officer supposed to do? I understand the idea that the officer needs to protect himself. But Terry addresses that very question. If you're going to approach and then determine, maintain control of the scene, in order to do a pat-down, you need to have articulable suspicion. Well, by this time, he has articulable suspicion because he sees a bulge and he sees somebody reaching for what appears to be a gun. And it turns out it is a gun. And under those facts, the officer can seize the gun. I guess the question is, if the defendant has been unlawfully seized, and here he has been unlawfully seized, can the officers use the gun against him? Or is it fruit? The problem, though, is that the seizure here is not necessarily a fruit of the illegal stop. Let's assume that when the officers got out of the car, the district court found that when they got out of the car, they had reasonable suspicion that all three of them were violating the ordinance. But let's forget about that. I don't know where that came from. So let's forget that. They only had reasonable suspicion to stop the person who was drinking from the bottle. But they clearly could approach him because he's breaking a state ordinance. And this is my first question to you. In the process of approaching the one who is drinking from the bottle, they notice White, and I looked at the testimony just now, they notice him taking a step back, reaching in toward his sweatshirt pocket with a bulge. Did not know for sure what the bulge was, but not being riverboat gamblers, they didn't want to take a chance on what the bulge was, and they then assumed that it was reaching for a gun. At that point, why wouldn't they have every right under Terry and Bostic and Roy and all the other cases to detain him, subject him to their control, to find out what's in his pocket, and if it is a gun, take it out. It's different than the traditional Terry stop. Because on a Terry stop, you're doing a protective pat-down, which is limited to the outer clothing, because you don't have any reason to suspect these people are armed. You're just conducting an investigation, but you want to protect yourself in the course of that investigation. So the law allows you to conduct a brief detention, and that detention can include a search of the outer clothing and a pat-down for weapons. This is beyond Terry, because you've got reason to believe the guy's got a gun. Even if you're wrong, you've got reason to believe the guy's got a gun. So you're not necessarily limited to the Terry parameter anymore. You can actually conduct assault as though this guy is armed. As Judge Ambrose said, the officer even yelled, gun. So even if the initial stop is bad, as opposed to your client, how does that help you in terms of getting rid of that gun as a fruit of the poisonous tree? The officer actually did what I think was reasonable. He said he sees the bulge, and really that's all we have. He sees the bulge in the hands in the pocket. Again, there's no outline. There's no suspicious behavior. There's no security check. He said he jammed his hand into the pocket. Shoved his hand in. Right. Yes. And what he said to him, which was reasonable, was, take your hand out of your pocket. Again, we're assuming facts here. He says, take your hand out of your pocket. That's what he's supposed to do, say, take your hand out of your pocket or stop, if he's got reasonable suspicion. He didn't have – He could do that, but you tell the guy to take your hand out of the pocket. And he only sees the gun. The hand might come up with a gun in it, and you're not – He sees the butt of the gun when Mr. White takes his hand out of the pocket. He never says Mr. White's about to pull the gun on him. That's not the testimony. In fact, he says, no, he wasn't about to pull the gun on me. But he doesn't have to wait. That's the point. He doesn't have to wait for him to pull the gun. No, but the question is, does the hand in the pocket standing alone give you reasonable suspicion to believe that there's a weapon? And the strongest evidence that it doesn't in this case is contrasting what they saw with Mr. White with what they saw with Mr. Corbin. Mr. Corbin, we have the pocket hanging down significantly. Here, it's hanging down by virtue of the hand slightly is what the officer says. Mr. Corbin is making suspicious eye movements. Mr. Corbin is doing the security checks. They can tell by looking at the pocket of Mr. Corbin that it's a heavy enough object to be a weapon. And by that time, they had already tackled Mr. White. And so there was one gun on scene, and they can reasonably assume a second gun is going to be on scene. When they approach Mr. White and they see the hand in the pocket, all they have is evidence that Davis is violating the open container. If we were here and we're talking about this same scenario in a high-crime area known for guns and drugs, and they had some independent knowledge that Mr. White was a drug dealer, or if they had seen not Mr. Davis drinking from an open container, but perhaps a suspected hand-to-hand transaction, I suggest I'd be in a very different position. If you're talking about or suspecting that the violation that we're approaching this guy to talk to him about or stopping this guy for is drugs, maybe the police officer would be reasonable to assume that what's in Mr. White's pocket at that moment is not one of the giant Samsung phones but a gun because the officers always testify guns and drugs go together. But here all we have, I mean, to take it to its logical conclusion, what this means is any time a young black man is walking down the street of a high-crime area, which happens to be his neighborhood, if he sees the police and puts his hand in his pocket, then he's subject to a seizure. Terry stopped, Terry frisked, and that can't be the extension. I wish that couldn't be the state of the law, but I'm not sure it isn't the state of the law. I'm not saying that. Well, let me not say any more about that. The government says this in the brief. Let me know if they're misstating it because they cite the appendix. They say that the officer testified, Lovingall testified they intended to talk only to Davis about the open container, but, and this is quoting from the brief, which is quoting from the appendix at pages 120, 144, 67, 75, quote, right away, one of the other two men, which is white, drew attention to himself by taking a couple of steps back, quoting the officer, and then immediately jamming his hand into his front sweatshirt pocket, right side, as soon as he saw the plainclothes detective's approach, and that Love testified he looked at white and he realized his pocket had a large bulge consistent with the firearm, based on his training, causing the right side of the sweatshirt to dip lower than the other side, and he became suspicious. Again, assuming the initial stop of the guy with the bottle is okay, and I think we're all agreeing on that, what should the officer have done in that context? He approaches, sees the guy, immediately stepped back, he hasn't said anything to this guy yet, to white, white immediately steps back, puts his hand in his pocket, the officer's attention is drawn to him, the officer sees a large bulge in his pocket, Mr. Jimbo said that would be consistent with the gun, the sweatshirt is dipping from the weight, what should the officer have done at that point? The first part of that question was, is the government's representation accurate, and the record is not clear on all of the timing. We know that the district court found that the stop occurred, and then the hand went in the pocket, and so again, our position is that it's fruit, the officers are where they are, the officers are where they are and see what they see, because of the unlawful stop that's already taking place, and so that's fruit of the unlawful stop. And so when you read Officer Detective Love's testimony, and the other officers' testimony, it can be read a number of different ways, but when he puts his hand in his pocket, he does say, that's when I noticed the bulge. He doesn't say, I mean, there's questioning that's fleshed out, well, do you think the bulge is consistent with a weapon? But actually, Detective Love's testimony is nowhere close to the level of explicitness that Detective Galt gives when he's describing Mr. Corbin's pocket and what's in his pocket. And when he says pocket dipped down, in fact, if you look at the district court's finding in that regard, the district court actually got it wrong. Detective Love testified that the pocket's dipping slightly, it's dipping a little bit, which, again, is consistent with a person just having their hand in their pocket. I mean, to assume that it's a gun at that moment, there's not reasonable suspicion at that moment. Does that develop as time goes on? Again, you know, we're talking about this guy. What should he have done is the question. Seize the large bulge. What should he have done? Hands in pocket, seize the bulge. He should have done what he did, which is to tell Mr. White to take your hand out of your pocket. And when the hand comes out, what he sees is the bottom of the gun. And then he sees the gun. Now, the question is, could he tell Mr. White at that moment to take the hand out of your pocket, or is that a seizure? So, you know, we're going down the road of when the seizure occurred. But you're not seriously suggesting that he couldn't tell White to take his hand out of his pocket? Take your hand out of your pocket, yeah. You know, in the cases where this court has talked about the idea of, you know, maintaining superintendence of the scene, it's been in the context, really, of traffic stops. You know, you're stopping a car, and the police, under all the Supreme Court precedent, can take the driver out of the car. And the passengers. And can take the passenger out of the car. And there's a recognition that there's been a seizure at that moment when the car is pulled over. So if something bad happens during the course of the stop, you know, they see a gun in someone's, you know, they get out of the car, they're taking the passenger out of the car, and a gun falls out. Yeah, they've got to grab the gun. They have to grab the gun to maintain safety. But if the stop itself was improper, was not based on reasonable suspicion, then the gun can't be used. Yes, the police can grab it to protect themselves. The question here is whether they can use it or whether it has to be suppressed in a criminal prosecution under the Fourth Amendment. Okay. I do understand your argument. Unless there's any other questions. Mr. Kokas. Good morning. May it please the Court. Donovan Kokas, AUSA, on behalf of the United States. Counsel in the previous case says a wise attorney never concedes an error, so I must not be that wise because in my brief, I conceded that the district court erred when it held there was reasonable suspicion to seize Mr. White at the outset of the encounter. However, that error doesn't make any difference if the district court also erred in finding that Mr. White was, in fact, well, as a matter of law, seized in the first instance at the outset of the encounter. It's important to note in Mr. White's reply brief, he assumes that when a seizure occurred is an issue of fact, but as the Kim case in this Court decided in 1994 indicates, that's a question of law. And this Court affirms on any basis supported by the record. This is one of those cases where the standard review, I guess, is my best friend because the record in this case indicates not one, but two distinct reasons why this Court must affirm. One, and this is the second one that I stated in my response brief, but this is the more accessible, familiar reason. Under Mendenhall, the circumstances of this case would not have conveyed to a White's position that he was being ordered to stop. And the second independent reason is that officers in this case did not intentionally direct the show of authority at White with the intention of stopping him. Taking that first – Well, yeah, the first one, I mean, how would – what time did this happen? About between 9 and 10 o'clock at night on an October. And so it's dark and there is an unmarked police car. People jump out. And how would you not think that you're seeing – if you start moving, probably you could get shot. Well, Judge Posner said in the Brewer case I cited in my brief that as a practical matter, people often will stop when they see police officers are approaching, but it doesn't tell you why they stop, whether they've done something. Well, the reason they stop is what Judge Emerald just said. They may be shot. It could be that. It could be – I mean, I've yet to find a case that says the mere approach of police officers, even if you recognize they're police, is enough to count. I mean, speaking only for myself, if I were in that situation and if the test is do I feel free to leave, I would not feel free to leave. Well, luckily for me, Your Honor, the test is whether an objective person in the circumstances would feel free to leave under Mendenhall. And Mr. White in his reply – What I'm saying is I think my position, my subjective statement to you, probably is what most people would believe objectively. That the mere approach of police officers – They jump out. Okay. I mean, they come out of the car. Four of them. Four of them. Okay. And do you think an objective person would think that he or she is not free to leave? I think an objective person might hesitate to – I'm sorry. But look at what Mr. Corbin did in this case. He paused for a second, and once he realized the officers weren't interested in him at that time, he started to walk away. Even Mr. White concedes that – He didn't get very far, did he? No, he didn't because he started behaving as though he had a gun, which he did. Even Mr. White concedes that when officers first got out, he didn't stop. He said he took a couple more steps. That's page 160 and 61 of the record. So in this case, you have to look at all of the circumstances, and here's what they are. You have unmarked car, no lights or sirens keening, three and then four plainclothes detectives get out. Badges are passively displayed on lanyards around their necks, and one of them announces Pittsburgh Police. But nobody tells anybody to stop. Nobody touches their guns. Nobody blocks their egress. What did they say as they got out of the car? Police? Pittsburgh Police. No one touches their guns. No one blocks egress. And if you assume momentarily – that they're trained, so that – I mean, why isn't that a blocking of egress? Well, as Detective Galt, I believe, in his testimony later on made clear, he wasn't blocking their egress. He said, you know, these guys could have walked across the street, they could have continued down one of the streets. They positioned themselves in a way so that the men can't get behind them or that they can't – you know, they have sort of a tactical advantage if something goes bad, as started to happen in this case. But, I mean, you know what? To me, when I look through this, it seemed like this was a case in search of a reason, that persons were stopped, two persons who were not allowed to carry weapons actually had weapons, and the judge is sitting there going, okay, what do I do? I could say, yeah, they were stopped because it's logical that all three of them were drinking from the liquor in the paper bag, which isn't logical. And, you know, what do you do? Because these persons clearly have done something that they should not be doing. They are felons in possession of a weapon, and there are significant penalties for doing that. And what I was asking Ms. Pietropalo was, okay, assume for the moment you said, for example, there was no reasonable suspicion to stop. You concede that. At the very outset, that's right. At the very outset. When they get out of the car to approach Mr. Davis. And I'm suggesting the next step was also covered, that there actually was a seizure, that a reasonable person would not feel free to leave. But almost instantaneously, the officer observes, and that's the finding of fact, something that appears to that officer based on this officer's training, and the officer has been trained, appears to be a gun, so much so that he yells, gun. Then they go into another mode, and then they take away the gun. Technically, if there's a seizure, you need probable cause, but the real probable cause didn't come until just a second or so after the perhaps, in my view, seizure. How do you do that? Well, I would just amend that to say one thing. I mean, if there's a seizure, they need reasonable suspicion to stop Mr. White. And the record shows, and there's really no dispute about this, I don't think, what Officer Love's observations were. The bulge hanging lower in the pocket, Mr. White's behaviors. I mean, unless they could show any of that is clearly erroneous, and I'm not sure how they can, then that's what we're stuck with. Even if that occurs after a, assume for the moment, again, back to the prior argument, you're not conceding this, assume that when they got out there was a seizure. And then they see the gun, and my question is, what are they supposed to do? Well, they're supposed to do exactly what they did, and I have a long footnote in my brief about this where I cite Pennsylvania versus Mims and other cases which say. Vehicular cases, though. I'm sorry, Your Honor? Vehicular cases. Yeah, they're vehicular cases, but the broad principles that for officer safety when they're effectuating a stop of other people, if something happens to give them reasonable suspicion that their safety is in danger, then they can act upon that. But a car dip is very different, because they can even take the passengers out, as I mentioned earlier, probably spread-eagle them on the ground, all four passengers, even if they're only interested in the driver. You're not suggesting, I don't think, that if four people are walking down the street, they're interested in one, police can come up and spread-eagle everybody and pat down the one guy that's interested. No, no, not unless, I mean, if they see something that gives them reasonable suspicion to believe these other pedestrians are armed, as happened in this case. Two cars are different, and your colleague's point is that if the seizure, if they're seized illegally and then they see the gun, they see the gun only as a result of the initial Fourth Amendment violation and the gun should be suppressed. I think that's what she's arguing, that if the seizure occurred without, well, here would be articulable suspicion, assuming that it's a Terry type of seizure, and they didn't have articulable suspicion vis-a-vis Mr. White, they seize him anyhow or they detain him anyhow, because the seizure's not really, Terry's type is not really a seizure under the Fourth Amendment, that if that detention is improper, it doesn't rise to the level of Terry, and then they see the gun as a result of that, she's saying that it still flew to the Poison Street, the gun should still be suppressed. If the gun's off the street, you can run the job, but they can't use it to prosecute the defendant. Right, right, I understand that that's her point, and that's why we're saying that there was no seizure, the record shows there wasn't a seizure in the first place. That's why it's kind of important to go back to the very beginning of the encounter and ask what were the defendants told at the outset, what was the show of authority in this case, which, as I spelled out, was pretty, I mean, I cite a bunch of unpublished cases from this court, which are even more overt shows of authority than this, when still no seizures were found. Do you promise not to do that anymore, citing unpublished cases? Well, I won't mention their name here, Your Honor, but... He's not citing, we're just... Just ignore them. Right, right. We have the same problem in the next case. That's okay, I don't ignore them as much as the others do. Yeah, but in this case, I mean, you know, Mr. White, in his reply brief, and this is important, he says, well, Detective Love testified that as soon as we got out of the car and approached and announced ourselves, that's why they stopped. He even puts those four words in bold quotes, but when you look at page 140 of the record, which he's citing, it doesn't say that. It says that's when they stopped. Telling us when somebody stopped doesn't tell us why they subjectively did, and it doesn't even answer the only question made relevant by Mendenhall, which is whether an objective person would feel compelled to stop. We don't have any evidence that that was... How would an objective person not feel compelled to stop? I mean, you're scared out of your wits. I mean, you've got four people, and they're coming at you, and they say, Pittsburgh Police. I don't care if you're a judge or you're a felon in possession. You're going to stop. Well, I think you might stop because you're curious about who they want to talk to, but in this case, remember... You stop because you don't want to get shot or chewed up. But in this case, we have testimony that from all three defendants, pages 162, 187, and 200 and 201, all three say at the outset that Detective Love addressed himself, either said Coley Davis or otherwise addressed himself clearly to Mr. Davis. Now, they're arguing that the district court found all their credibility to be absent on every issue, but if you look at 271, the court only found that their general testimony, that officers got out and just started tackling and frisking them, that that was incredible. If you look at Detective Love's testimony, it's consistent with this because he says at page 119, we got out of the car and we directed our show of authority at Davis. Now, he doesn't say what he means by that then, but later on at page 137, he says, when I would see Davis after having arrested him six months earlier, if I saw him and I wanted to talk to him, I would call out his name. In this case, I submit it's a reasonable inference, at least, maybe the only reasonable inference, that in this case, as soon as he got out, he said Coley Davis, therefore alerting these other two guys that they weren't the problem. No, you can just go on. It's fine. I mean, all I can say, Your Honor, is I get... I even agree with you. Let me put it like this. If I saw several police officers approaching me, I might stop as a practical matter to see what it was they wanted. Now, that doesn't mean it's a Fourth Amendment... I mean, the way that you could have... In theory, the police officers could have got out of the car and said, excuse me, can we... Coley Davis, can we talk to you for a second? And that might have been a reasonable suspicion that he had a liquor, open liquor, on a public street, and... but they didn't. And that's why you have the problem that you have, and that's why you made the concession that you did, which I appreciate. So do I. I really do. It's the work of a good lawyer and a professional attorney. Amen. But that's not what they did. They did something different. They made... they had a show of authority. They said, Pittsburgh Police, and they got in various positions very quickly, and then one of them says, I saw this bulge in his pocket, I saw him moving his hand with his hooded sweatshirt in a way that indicated he might have a gun, I saw it sagging to one side. Corbin then tried to walk away, and Corbin, they said, oh yeah, we saw something with him as well. So I guess, was he the one you saw with the butt of the gun, or was it... No, it was Mr. White. Right. And so, I mean, again, it seems like it's a case in the interstices of what our law is, and there's a search for a reason. And as I said, some of the reasons given by the judge here, to me, didn't make sense that it's logical that all three would be bringing... Well, and that's why I said at the outset, Your Honor, that the standard of review is my best friend. We look at the whole record, and we view that in a light most favorable to the government. I think that was from the United States versus Myers, a 2002 case. I think that was yours, Judge McKee. Had a bad day then. I'm sorry? Had a bad day then. Where we draw all reasonable inferences in favor of the government. And I propose that it's reasonable to infer, based on Detective Love's testimony, even put aside what the plaintiffs, the defendants all said, which is Detective Love indicates that he addressed himself in some way to Coley Davis at the outset. Now, that changes things for me. Because if I'm on the street with two other guys and police show up and they say one of the other guys' names, I might hang around because I'm curious what's going to happen to them. Maybe I'll experience some schadenfreude or something when I see what happens to them. But the bottom line is, do I feel compelled to stop within the meaning of the Fourth Amendment? And I don't think that I do. I mean, I don't think our law gets us there yet. So in this case, I think the first, arguably the first time that Mr. White is seized is when Detective Love says, take your hand out of your pocket. Now, Corey, whether that's a seizure, because under HODAR-ED, we know there has to be a submission to the show of authority, and his submission is by taking his hand plus starting to take a gun out of his pocket. I think it would be very dangerous to say that that was a submission to show of authority. And even if you say at the outset these officers intended to seize all of these guys, which is contrary to Detective Galt's testimony and contrary to any testimony of the district court found credible. But, you know, that's what he's supposed to say. I didn't, again, I guess saying for the third or fourth time, it's a case in search of a reason. These two persons, besides Davis, had guns. And they shouldn't. There are big penalties for it. And they're giving testimony that indicates that they saw something that indicated to them that these persons had weapons on them. And they were very specific about that testimony, and none of it has been shown to be clearly erroneous. I mean, remember, the record itself we reviewed for clear error, even though the legal issue is de novo. So I'll end with the same question I asked before. If there was a seizure when they got out of the car, if there was, and you're not conceding it, you said in response to my question earlier, they should have done exactly what they did earlier. But then the question is, does that get suppressed because they shouldn't have been seized to begin with? No, I don't think it does. And I don't think you have a submission to the show of authority, even at the moment officers get out of the car. Remember when Detective – That gets around the question. The question is, assume there was. Assume there was a seizure. Then what happens? Candidly, I don't know. I mean, I briefed this case this way because the evidence clearly shows to me there wasn't a seizure at the outset. If the court's going to find there was a seizure, I honestly don't know. Or remand to get further fact-finding as to whether there was a seizure. Well, in this case, we don't need any more fact-finding because you had both the officers testify what happened start to finish. All of the defendants testified start to finish. I mean, at this point, what I think we have is we have a pretty complete factual record where this court can examine that question de novo, remember, and affirm on any basis supported by the record. Thank you. Thank you. Just briefly to address Judge Ambrose's question first. The Supreme Court has made clear that a citizen can't be detained even momentarily without reasonable objective grounds for doing so. So even if the initial seizure was momentarily and then things started to happen, it's still a seizure and my earlier position stands that it's fruit. That's theoretical. But practically speaking, I mean, that's why I ask you, what should a police officer practically do? Okay, so maybe they seize them a little too quickly, but then it turns out that they find almost immediately that there's a real problem. One of them has a gun and within a few seconds they find the other one has a gun. And so what are they supposed to do? Are you supposed to suppress that? Yes. I stand by my earlier answer on that. It didn't hit me until just now because I didn't see this as a big groundbreaking case, but given the way our controlling authority has been going lately, if they were to get a case where there's a momentary seizure, just the kind of momentary seizure that the Court has said the Fourth Amendment allows under the encounter rubric, but that initial encounter didn't rise to the level of the Fourth Amendment, it was illegal, let's say. But during the course of that split second illegal detention, the police saw something which then justified them going forward. And traditionally, you're right, that would be through the Poison Street. I know Mr. Kokich doesn't agree with that. But you get a case where there's an initial illegal seizure under these circumstances during which the police immediately see a gun, it's very easy to then reason that the seizure did not lead to the gun or that the seizure was independent. The seizure of the gun was independent of the seizure of the people because they would have seen what they saw once they got out of the car, which they could do to stop the guy with the bottle. They would have seen that. Again, it's they're where they are because they've illegally, unlawfully stopped these people. They're where they are because they wanted to stop the guy with the bottle and they didn't go through the decorum of saying, we want to arrest you, Corley, is that his name, with the bottle? Or Davis with the bottle. If it had happened that way and they said, you with the bottle, stay still, you two beat it. They don't have to say that. You'll agree that. They don't have to do this according to the rules of the world. What happened here was a seizure of all three and the court found that as fact. That's not a fact, that's the conclusion of the law. Well, the court found that the officers had a show of authority that all three submitted to the show and that they stopped walking at this moment. And Ornelas, which is the case that talks about standards of review for problem-causing reasonable suspicion cases, says, even if we're talking historical facts, of course, are entitled to deference. If we're talking about inferences drawn from those facts, those, too, are entitled to great deference. And the reason is the judge who's drawing the inference that they are submitting to the show of authority is he's in the community, he knows the community. And so his, even though what he's thinking. I'm not so sure that the judge knows this community. If this is the kind of community that's been painted out in the special justice. Let me say, it's on the record. My guess is the judge has never been there. It's on the record, however, that he knows that, you know, just a couple months before this stop, there's the beating in the Jordan Miles case of a young black man on the street by police officers. And in this very Northview Heights project, just recently, Officer Love testifies, there was a police shooting and killing of a black man who they thought was running away. So these are, it's not just the actions of the officers. Who was probably afraid to leave. It's not the action, just the actions of the officers. It's also the setting in which the stop takes place. That's my suggestion. You might win the battle and lose the war. Because this is the perfect case. We can't reach our decision based upon this, but it's a perfect case to create a body of law which says that even where the, even where the initial seizure is illegal, where the seizure is only momentary, and the initial, the seizure of the person is momentary, and leads to an observation which would, in and of itself, justify subsequent seizure or contraband, the seizure of the contraband is not so derived from the initial seizure of the person as to justify suppression. And you can see that kind of a whole thing coming out of this case. I would hope that it wouldn't come, given that it hasn't been briefed in any way, shape, or form. The government's position really all along has been one that's based on some misstatements of the fact about Officer Love actually testified, but he did not call out to Cooley Davis. He was specifically asked that question, and he denied speaking with Mr. Davis. This is at Appendix 143. But the government's position all along has been there's no seizure because the officers didn't intend to target Mr. White. They intended to target Mr. Love. And although I talk about factually why that's not a supportable theory, I did also want to point out to this Court that the United States Supreme Court in Brendan v. California expressly considered and rejected that target theory, that repeatedly saying, you know, it's not the subjective intent of the officers that controls, and that the government's position is really based on a misreading, a misconstruction of some of the Supreme Court precedent that's cited in the government's brief. Do I understand your argument, then, that although it was okay for them to stop Davis because he had an open container, that they should somehow, it was incumbent upon them to sort of purge their intent by telling the others they can leave? My position is, you know, it's always been. And in that period, in that time period, we want Davis, the rest of you guys can go. It's always been the reasonable person standard in the totality of the circumstances. And given the approach, sort of the aggressive use of the car, pulling within steps of these three gentlemen, the fanning out by four police officers to approach the tactical positioning of to provide cover, he said, and to pursue someone if they start to run. That's what makes this a seizure and not just a stop. Detective, one of the detectives, I forget which actually talked about, sometimes they'll just approach or yell out from the car, you know, and I'm not suggesting they need to do that in this case. I'm suggesting they chose to conduct the seizure in a way they knew, and this is Detective Galt's testimony. We know when we pursue, when we initiate a stop like this, multiple officers displaying our badges, we know that most people stop. That's the choice they made in engaging in the show of force, and it resulted in a seizure here of all three gentlemen, and that was the finding by the district court, and it is entitled to deference. Thank you very much. Thank you. Very well argued, but both of you did a very fine job with this case. Thank you very much.